[Cite as *State v. Johnson*, 2020-Ohio-5255.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                                        No. 109041

v.                                      :

JAMES JOHNSON,                          :

    Defendant-Appellant.         :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED AND REMANDED
**RELEASED AND JOURNALIZED:**  November 12, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-17-614707-A

---

## *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Brandon A. Piteo, Assistant Prosecuting Attorney, *for appellee.*

Mark A. Stanton, Cuyahoga County Public Defender, and Noelle Powell and Robert McCaleb, Assistant Public Defenders, *for appellant.*

EILEEN A. GALLAGHER, P.J.:

{¶ 1} Appellant James Johnson ("Johnson") appeals his convictions entered in the Cuyahoga County Court of Common Pleas following a jury trial. Johnson asserts four assignments of error:

1. Mr. Johnson's convictions were against the manifest weight of the evidence.

2. The trial court erred when it denied Mr. Johnson's motion to suppress unreliable witness identifications obtained through the use of a suggestive photo array.

3. The trial court erred in denying Mr. Johnson's motion to prevent the prejudicial and cumulative presentation of gruesome photographs.

4. The trial court abused its discretion when it denied Mr. Johnson's motion to waive costs on the basis of indigency.

{¶ 2} Finding no merit to the appeal, for the reasons that follow, we affirm but remand for a nunc pro tunc journal entry which reflects the sentencing on the renumbered counts of the indictment and to include the mandatory three-year term of postrelease control on Count 17.

## A. Procedural History

{¶ 3} On February 28, 2017, a Cuyahoga County Grand Jury charged Johnson in a 19-count indictment. Specifically, Johnson was charged with four counts of aggravated murder, with one- and three-year firearm specifications, a specification that the murder was committed while the defendant was under detention or an escape, a course of conduct specification, three felony murder specifications, repeat violent offender specifications and a notice of prior conviction; two counts of murder, with one- and three-year firearm specifications, repeat violent offender specifications and a notice of prior conviction; two counts of felonious assault with one-and three-year firearm specifications, repeat violent offender specifications and a notice of prior conviction; one counts of aggravated burglary, with one- and three-year firearm specifications, a repeat violent offender

specification and a notice of prior conviction; four counts of aggravated robbery with one- and three-year firearm specifications, repeat violent offender specifications and notice of prior conviction; four counts of kidnapping with one- and three-year firearm specifications, repeat violent offender specifications and notice of prior conviction; tampering with evidence and having weapons while under disability.

{¶ 4} These crimes were related to the homicides of two individuals, to-wit: Brandon James and Rasheed Bandy, assault as to the same persons, the robbery of Brandon James, Rasheed Bandy, Talton Ballard and Jacob Ferrato and the kidnapping of those four individuals.

{¶ 5} The state sought the penalty of death. The specifications which would allow for the imposition of a death sentence were, during the course of these proceedings, dismissed by the state of Ohio.

{¶ 6} Prior to commencement of trial, the court addressed various motions, including Johnson's "motion in limine to exclude photographs of the deceased" which the court denied. However, in denying that motion, the court did state that it "will limit the photographs to ensure the photographs admitted will be non-repetitive and are probative."

{¶ 7} On January 12, 2018, a jury was impanelled and sworn. On January 20, 2018, that jury returned a verdict of not guilty as to the first count of aggravated murder but guilty as to the remaining counts with which they were charged to deliberate. On January 24, 2018, after a hearing and without objection, the trial court granted Johnson's motion for mistrial.

**{¶ 8}** On July 23, 2018, the case proceeded to trial by jury for a second time. Johnson executed waivers of jury as to the charge of having a weapon while under disability, the notices of prior conviction and repeat violent offender specifications. On August 3, 2018, the trial court declared a mistrial after the jury failed to reach a unanimous verdict.

**{¶ 9}** On July 23, 2019, a third jury was impanelled and sworn and the case again proceeded to trial. On July 31, 2019, guilty verdicts were returned by both the jury and the court as to all counts.

**{¶ 10}** The court renumbered the counts of the indictment after the jury found Johnson not guilty of aggravated murder as charged in Count 1 in the first trial and after the state dismissed tampering with evidence as originally charged in Count 18.

**{¶ 11}** The trial court sentenced Johnson to "a total sentence of life without parole, plus an additional 149 years" and advised him as to the mandatory five-year period of postrelease control on all counts except for Count 19, which the court advised Johnson he was subject a mandatory three-year period of postrelease control.

**{¶ 12}** Specifically, Johnson was sentenced to terms of life without parole for aggravated murder as charged in Counts 2 and 3, in addition to ten years for the repeat violent offender specifications and three years for the firearm specifications, with the three-year terms to be served prior, and consecutive, to the life without

parole sentences. The court merged Counts 4, 6, 8 and 15 with Count 2 and it merged Counts 5, 7 and 14 with Count 3.

{¶ 13} For each of Counts 9, 10, 11, 12 and 13, Johnson was sentenced to 11 years on the base charges along with ten years on the repeat violent offender specifications and three years on the firearm specifications, to be served prior, and consecutive, to the base charge sentences of 11 years.

{¶ 14} For Count 19 Johnson was sentenced to a term of 36 months.

{¶ 15} These sentences are not in skew with the renumbered charges as presented to the jury in the third trial.

{¶ 16} Finally, we observe that the trial court made appropriate findings as to the required factors of the law and found that prison was consistent with the purpose of R.C. 2929.11.

**B. Factual Background**

{¶ 17} This appeal pertains to the third trial, at which the following facts were adduced.

{¶ 18} On January 21, 2016, Rashaad Bandy and Brandon James where both shot and killed in their apartment in the Archer Apartment Homes building in Cleveland, Ohio.

{¶ 19} Talton Ballard and Jacob Ferrato were in the apartment with Bandy and James at that time and witnessed the shootings. Ballard identified Johnson as the shooter. Ferrato was not able to make an identification.

{¶ 20} Three other people, Anthony Lemons, James Southerland and Toronto Cunningham, were also visiting Bandy and James that evening; however, they were not in the apartment at the time of the shootings. Lemons confirmed that Johnson and an unidentified man entered the building. Southerland testified that as he was descending the stairwell, he passed two men who were walking up and, five to ten minutes later, he saw the same two men walk down the stairs and exit the building together.

{¶ 21} Cassandra Core was the concierge working in the Archer lobby that evening. Detective Raymond Diaz from the City of Cleveland Division of Police conducted the investigation.

{¶ 22} There is surveillance video from the Archer, however it provides an incomplete view of the events that transpired that evening. Although the video provides only a partial account, it nevertheless buttresses and confirms the witnesses' testimony. The video demonstrates that the movements occurred between 7:57 p.m. and 8:12 p.m.

{¶ 23} Johnson admitted that he was at the Archer to see Bandy within that fifteen-minute period. Further, Johnson confirmed that he was one of the men depicted in the surveillance video.

**Talton Ballard**

{¶ 24} Ballard, who was involved in creating custom high-end sneakers, testified that he and Brandon James were business associates and friends, and that he met Rashaad Bandy through James. Ballard met James working in retail and

described him as a "mover and shaker" and a talented photographer and videographer. Ballard described a prior project that he and Brandon worked on together: "[n]ormally people look at what I do, or they come to my page, and they think it's magic, you know, you just do the shoes, and all of the sudden they look awesome. But [James] wanted to capture the process. So he actually invited me over to [Bandy's] house. And that's how I met [Bandy]."

{¶ 25} Ballard stated that it was not unusual for him to see Bandy or James smoke marijuana, although he did not use the drug. Ballard was unaware that Bandy and James sold marijuana. In January 2016, Ballard was living in Georgia, but came to Cleveland after James referred him for a job redesigning a failing clothing store with the hope of "bringing it back to life." The project was expected to take about a month to complete and James was documenting the work. "We were going to capture the whole breakdown tear down of the store and then the build up."

{¶ 26} Ballard described the atmosphere in the apartment on the January 21: "the whole vibe of the house was that we were celebrating that we closed the deal [to redesign the store], we finally closed the deal." Ballard testified that Ferrato, Lemons, Southerland and Cunningham were also at the apartment and that "there was drinking" and "a little smoke."

{¶ 27} Ballard testified that at a certain point in the evening "two guys walked through the door. And that's when I kind of took inventory." Ballard, who was standing near the door, saw that one of the men who walked in was taller than the

other and that the shorter man was in front.  "It was just strange * * * two guys walked through the door and we just heard a loud bang noise."

{¶ 28} Ballard testified that he was shocked and looked around to see what was happening "[a]nd that's when we noticed that guy in front had a gun in his hand * * *."  He explained that "[w]hen I looked down at the guy's hand, and I saw the seriousness in his face, I knew that this wasn't a game."  Ballard heard Bandy say "[m]an, come on, man," and the shorter man respond, "[n]o, don't come on, man. You know what this is."  From this exchange, Ballard thought that it "[s]eemed like they knew each other," adding further that "[n]obody came through doors unless you knew somebody."

{¶ 29} Ballard testified that after this exchange between Bandy and the shorter man, that "[James] now walks down the hall, and he's on his phone, and he's looking down, and he looks up, and he notices that there's a gun * * * and he tried to go back down the hallway, and the guy in front, the shorter guy shot him in the back."

{¶ 30} The taller man also had a gun and pointed it at Ballard, and said "where is the stuff, you know."  Ballard responded that he did not know and that he did not live there.  At this time, Ballard did not know what the shorter man was doing, "[b]ut I knew that he was in [the bathroom] possibly having a discussion with [Bandy], because of the way they were interacting when they first came."

{¶ 31} The two men "switched places" and the shorter man began interrogating Ballard, asking the questions — "same questions, more aggressively."

It was at that point that Ballard saw the shorter man's face and observed that "his eye was definitely slanted, that one of his eyes were squinted."

{¶ 32} The two men switched places again. This time "there's no conversation. There's no conversation until we hear another shot. That's when he asked me the same questions again. And he told me to empty my pockets." Ballard stated that "[t]he taller guy was even startled by it [the gunshot]."

{¶ 33} Ballard observed the shorter man coming out of one of the bedrooms with "a bag that he was zipping up" which he set on the couch and then proceeded to reload his gun. Ballard quietly made his way into one of the bedrooms and closed the door behind him. He stood by the door. Shortly thereafter Ballard heard the men coming back down the hall and he heard them say "we got to go, he's gone." Ballard then heard them leave, but he stood by the door for "[m]aybe 15 seconds" before opening it and realizing that James "needed help, because of the way I heard him breathing." Ballard saw that Bandy had been shot in the back of the head and was still breathing. He also saw Ferrato hiding behind the couch. Ferrato and Ballard realized that the assailants had taken both of their phones. Ballard said "[w]e need to go downstairs, we need to get help" and he told Bandy, who was still breathing and moving, "I'll be back." Ballard made his way to the front entrance where he came upon Core and told her what happened. She then called police.

{¶ 34} Ballard admitted he was initially apprehensive about speaking to the police and was reluctant to talk with the responding officers. Ballard explained:

[The officers] seemed to be heightened because of the situation, and I didn't trust that I would be handled in a way that I thought was — I don't know, I didn't know what could happen.

{¶ 35} However, Ballard explained that "[a]s soon as [Detective Raymond Diaz] got there, I pulled him to the side, and I told him everything." Ballard described the shorter man as being about 5′9″, with a wide mouth and a lazy eye. Ballard then reviewed surveillance video from the Archer and identified the "tall guy" and the "shorter guy" that walked into the apartment. Ballard was clear that the two men depicted in the surveillance video were the perpetrators of the crimes.

{¶ 36} The following day, Ballard was shown a photo array that included an image of Johnson. Ballard selected Johnson out of the array, but noted that he was not "100% sure." Ballard testified that he was "about 50% sure" of his selection.

{¶ 37} At trial, Ballard was asked if he either of the two men he identified in the video as the assailants were present in the courtroom. He identified Johnson in the following exchange:

Q. And who do you see in this courtroom?

A. That's the shorter one. That's the shooter.

The Defendant: You're a liar.

Q. Talton, he just called you a liar * * * [w]hat do you have to say to that?

* * *

A. I think he's just as cold-blooded as he was that night still today. He doesn't care.

{¶ 38} When asked about how he was only 50 percent sure when he identified Johnson in the photo array, but was certain when he subsequently identified Johnson in court, Ballard stated:

> So [the photo array] was the day after. This right after I saw everything. Never seen anything like it before. So the pictures that kept on sticking in my mind in the beginning were my friends. I couldn't stop seeing their faces. I couldn't stop seeing [Bandy] laying there still breathing. And it hindered my ability to recall and see very clear. After I accepted the fact that my friends were gone, and they had been murdered * * * this is the face that I've been seeing ever since * * * it's the same face.

**Jacob Ferrato**

{¶ 39} Ferrato testified that he is a shoemaker and came to know James as a photographer and was associated with him professionally. He met Bandy the night of the shootings. He had spent approximately two hours at the Archer apartment and was preparing to leave when "someone else came in the door and shot a gun in the air." Ferrato did not see much, as he explained, the gun "went off right in my face * * * my vision went white, you know the flash went white, and I had the ringing in my ears. So I was totally disoriented." Ferrato hid behind a couch and tried to stay out of the way for the entire time. He did not get a good look at either assailant and could not identify either of them.

**James Southerland**

{¶ 40} Southerland testified that he is a photographer and videographer. He met James when they were in school, but they lost touch. They became reacquainted as James was learning the photography trade and the two did some projects together. Southerland met Bandy through James. Southerland explained that

Cunningham, a local hip hop artist, was "not just a client," but "family as well." Southerland was putting together a music video for Cunningham. Cunningham came to the Archer apartment that evening to preview the video, pay Southerland and get a copy of it. Cunningham left the apartment, and approximately five minutes later called Southerland because he forgot the jump drive with the video on it.

{¶ 41} Southerland went downstairs to meet Cunningham at the outer door to the building to give him the drive and explained "as I'm going down the stairs, I heard the door open, you know. I'm on the eighth floor. The door [to the outside] is on the fifth floor so I'm just being cautious, just natural you know. I passed two gentlemen." Southerland did not know these men and described them as being "definitely bundled up" and assumed they were "extremely covered to stay warm." Southerland observed that one of the men "looked at [him] with a lazy eye." He passed them in the stairwell at some point between the fifth and eighth floors. While waiting at the door for Cunningham to return, Southerland observed the two men "kept coming up and down the steps" and thought that behavior was "fishy."

{¶ 42} Southerland and Cunningham met in the outer doorway to exchange the drive, and stood there continuing to talk for "maybe five to ten minutes." He explained that while he was talking with Cunningham, the same two men came back downstairs and exited the building, walking between him and Cunningham. "If I'm standing talking in the doorway, just me and [Cunningham] — no excuse me. They didn't give me time to move. Just walked right in between." The men didn't say

anything.  Southerland testified that "[Cunningham] called out that one of them dropped a gun which I did hear.  I didn't know what it was until I turned around seen one of them picking it up and at that point I noticed the duffel bag."

{¶ 43} Southerland testified that at that point he was done talking with Cunningham and went back upstairs to the apartment.  He walked in and saw that Bandy was "on the floor fighting for his life" and that the place was "ransacked."  "I couldn't see [James], and I was in a state of what am I supposed to do, should I help.  I'm trying to call.  My phone dies.  I've never been in this situation."  He ran downstairs to the leasing office to call the police.  In the office he reconnected with Ballard.

{¶ 44} Southerland testified that he had never seen either of the men he passed in the stairwell before that evening and had not seen them since.  When asked if he saw either of the men in the courtroom he responded "I don't remember."

**Toronto Cunningham**

{¶ 45} Cunningham testified that he grew up with James and that they had been friends since the third grade.  He explained that he went to the Archer apartment to review and pay for the video that Southerland had made for him.  After that exchange, Cunningham left the apartment and the building and drove away in his car.  He realized that he had left the jump drive in the apartment.  He called Southerland and asked if he could bring the drive down because he was in a hurry.

{¶ 46} Cunningham explained while he stood in the doorway talking with Southerland he saw two men that he did not know leave the building and did not

pay much attention to them.  He did observe that "[t]hey had a bag, and one of them dropped something."  He testified that he was not sure what was dropped, but that "[i]t just made noise" that was "loud enough to make me look."  Cunningham left and found out about the shootings later.

**Anthony Lemons**

{¶ 47} Lemons testified that Bandy was "[l]ike a little brother to him."  They were on the same family cell phone plan.  That evening, Lemons briefly stopped by the Archer apartment to pick up some money for the phone bill.  He spoke with Bandy for about two minutes.

{¶ 48} Lemons testified that before he left, Bandy told him to do something.  Lemons proceeded downstairs and stood "for a minute or two to open the door" for "[Bandy's] nephew" named "James."  Lemons stated that he "opened the door, said what's going on and kept going."  Lemons testified that he had seen James before, "[p]robably at a family function, you know, a cookout, something like that."  Lemons said James was with "a young man I had never seen before" and that "they were coming in as I was going out."  Lemons identified Johnson in the Archer surveillance video as well as in court.  He confirmed that Johnson was the same person he let into the Archer.

**Cassandra Core**

{¶ 49} Core testified that she was the concierge on duty in the Archer lobby on January 21.  She explained that she served as the intermediary between visitors and guests, granting access to desired guests.  Core stated that evening she heard

"the hustle and bustle" at the front door and noticed two men walk in together, a "taller guy" and a "shorter guy."

{¶ 50} Core testified that she was not able to describe the taller man because he turned his face away from her. She stated the shorter man had a "dark complexion" and described one of his eyes as being "offset." When asked if he had a "lazy eye," Core responded "I don't know if it's a lazy eye, but it was off to the left." She stated that it was his left eye. The taller man was wearing a "Blues Clues" backpack, which Core found strange due to that being a children's television show.

{¶ 51} Core asked the shorter man who he was there to see. He gave her the last name "Johnson." She testified that "when he gave me the name, I think at that point he seemed like he was getting a little agitated." She wanted to keep him calm because she was "getting some sort of vibe from him." She saw him reach into his pocket and said this made her fearful. Core felt relieved when she saw that it was a cell phone that he pulled out.

{¶ 52} The shorter man called somebody on the phone and said "[w]here are you, I'm down at the front desk." Core thought the shorter man said "[o]h, you don't live here," or "[t]his is not your apartment" or something to that effect. Core stated that the men began to exit the building and the shorter man told her "I'm at the wrong apartment." She repeated "you're at the wrong apartment" and the taller man turned back toward her and said "yeah."

{¶ 53} After they left, Core made a note about her encounter with the two men. She testified:

I just jotted down what I see — what I seen. "Blues Clues" backpack, Johnson was the name that they gave, black clothing, 8:00, two guys said there he was there to visit an uncle, very shady, shorter, and I described his eye, and tall with Blue — child.

{¶ 54} Core testified that "10 minutes or so later" another man came to the door. This was Southerland. "[H]e couldn't speak, he couldn't talk, it was like he was in shock." She asked if he was okay and he told her that "something bad had happened." Core thought he said that somebody had been shot. Another man came into the lobby through the front door. This was Ballard. Core described him as "frantic." She stated he went past her directly to the other man to make sure he was okay. Core called the police.

**Detective Raymond Diaz**

{¶ 55} Diaz testified that he usually arrives on scene "within a half hour, an hour" of when a 911 call is placed, but that in this case, since the Archer was "three blocks over from our office," he arrived "very quickly."

{¶ 56} Diaz stated that he interviewed Ballard after his initial crime scene "walk-through." Diaz stated that he began interviewing Ballard down the hallway from the crime scene. Diaz explained that at that point Ballard provided a description of the perpetrators:

> [Ballard] described the suspects as — one of the males being approximately 6′1″ to 6′2″, thin build, and he had a backpack that he was carrying. He described the second male I believe being 5′9″, he said he had a wide mouth and he had what he thought was a lazy eye.

{¶ 57} After getting this information from Ballard, Diaz continued the interview in the management office so that Ballard could review the surveillance

video footage. After viewing the video, Ballard confirmed that the two men depicted in the video were the same two men who perpetrated the crimes.

**James Johnson**

{¶ 58} Johnson took the stand in his own defense. His testimony was more or less consistent with the other witnesses' testimony including his agreement that he was the shorter man depicted in the surveillance video. Johnson also explained that he was "born with a lazy eye." However, contrary to Core's description, it is his right eye that is afflicted, not his left.

{¶ 59} Johnson denied any involvement in the shootings and claimed he never entered the apartment. Johnson also asserted that he did not know who the taller man was and that the taller man did not accompany him to Bandy's apartment and was not with him when he exited the building.

{¶ 60} Johnson described his relationship with Bandy, explaining that Bandy was the son of Johnson's grandfather's "long-time" girlfriend. He explained that Bandy was seven years older than he and that he looked up to Bandy when he was younger. Johnson described Bandy as "kind of like" an uncle and said that he would refer to him as his "uncle."

{¶ 61} Johnson testified that he and Bandy had a business relationship: "I mean, basically, we — I bought and sold weed." Johnson testified that he sold marijuana and that Bandy bought it from him. He explained that "[m]ainly" Bandy would buy from him, but on occasion, he would buy from Bandy.

**{¶ 62}** Johnson claimed to know nothing about the shootings and asserted that he was not involved. He claimed to be at the Archer for another purpose that evening. Johnson stated that Bandy informed him that he had some "wax" that Johnson might want to buy. Johnson explained that "wax" is a derivative marijuana product that is "like THC oil." Johnson was interested and went to the Archer that night to buy some.

**{¶ 63}** Johnson claimed that he went to the Archer alone, but that he walked in at the same time as the taller man depicted in the video. Johnson said that he was on the phone with Bandy as he was walking up to the door and that Bandy told him that "I got some other people coming up with you, so just come up with him." Johnson claimed at that point the unknown taller man asked him if he was "B's people." He explained that "B" was Bandy's nickname. Johnson explained that the taller man was "not actually with me, but he's going to the same place that I'm going."

**{¶ 64}** Johnson testified that in the lobby, he told Core that his name was James Johnson and that he was there to see his uncle who lived on the eighth floor and that his name was James Johnson. He called Bandy who told him he was at the wrong door. Contrary to what Core testified, Johnson claimed he then told Core he was at the wrong door.

**{¶ 65}** Johnson and the taller man continued to the door to which Bandy directed him. Lemons, who was there waiting, let them in and then he left. Johnson claimed that he did not know Lemons.

{¶ 66} Johnson said that he proceeded up the stairs and went directly to Bandy's apartment. He claimed that when he arrived at the apartment he was by himself and did not know where the taller man was. Johnson knocked on the door, Bandy answered, and they conducted the transaction in the doorway. Johnson said he gave Bandy one hundred dollars and Bandy gave him three grams of wax without ever entering the apartment.

{¶ 67} According to Johnson, after the transaction, he left. However, rather than proceeding directly to the stairs the way he came, Johnson inadvertently opened the door to another apartment. He explained "I think I accidentally thought that was the exit." He closed the door, found the actual exit and went down the stairs. Johnson claimed when he was going downstairs he passed the taller man, who was himself going upstairs. Johnson claims he left the building by himself, got into his truck and left.

## C. Analysis

### 1. Manifest Weight of the Evidence

{¶ 68} In the first assignment of error, Johnson claims his convictions are against the manifest weight of the evidence. He claims the evidence "did not attain the high degree of force and certainty required for a criminal conviction."

{¶ 69} Evaluating a challenge to the weight of the evidence requires this court to review the record, weigh the evidence and reasonable inferences, consider witness credibility and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and thereby created a manifest miscarriage of justice. *State*

*v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A manifest weight challenge attacks the credibility of the evidence presented and questions whether the prosecution met its burden of persuasion at trial. *State v. Whitsett*, 8th Dist. Cuyahoga No. 101182, 2014-Ohio-4933, ¶ 26. A weight of the evidence challenge "addresses the evidence's effect of inducing belief," i.e., whether the state's or the defendant's evidence is more persuasive. *State v. Wilson*, 113 Ohio St. 3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, *Thompkins* at 386-387.

{¶ 70} In conducting such a review, we are mindful that witness credibility and the weight to be given to evidence are primarily assessments for the trier of fact. *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Reversal on the weight of the evidence is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 71} Johnson challenges the weight of the evidence in three respects: (i) questioning Talton Ballard's identification of Johnson as the shorter man, (ii) assailing the character of witness Damon Johnson and (iii) asserting that no physical evidence links him to the crimes. We address each in turn.

**i. Talton Ballard's Identification**

{¶ 72} Johnson argues that Ballard, the only witness who identified Johnson as the shooter, reached this conclusion only after improper assistance and suggestion from the police. Johnson contends that his conviction was against the

manifest weight of the evidence by attacking Ballard's credibility: Ballard's confident in-court identification is undercut by the fact that he was previously not "100% sure" identifying Johnson in a photo array. Witness credibility "primarily for the trier of the facts." *DeHass* at paragraph one of the syllabus. Nevertheless, the record belies Johnson's claim.

{¶ 73} The evidence reflects that police arrived on scene shortly after the crimes occurred and that Ballard described the two assailants to Diaz, including that the shorter man had "what [Ballard] thought was a lazy eye." Immediately after providing this description to Diaz, Ballard viewed the Archer surveillance video and confidently identified the two men depicted as the assailants, including the shorter man with the "lazy eye," who everybody, including Johnson himself, agrees is Johnson. The jury chose to believe Ballard, regardless of whether his confident in-court identification, in light of his prior less-than confident photo array identification, had any impact on his credibility. *See State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964) (It is the province of the jury to "believe or disbelieve any witness or accept part of what a witness says and reject the rest."); *see also State v. Dennis*, 10th Dist. Franklin No. 05AP-1290, 2006-Ohio-5777, ¶ 13 (witnesses' trial identifications of defendant, despite prior failures to identify defendant in photo arrays entered into evidence, presented credibility determinations for the jury).

**ii. Damon Johnson's Testimony**

{¶ 74} Johnson next asserts that the convictions were against the manifest weight of the evidence by assailing Damon Johnson's character and calling his

testimony into question. Regardless of the veracity of Damon Johnson's testimony or whether it was incredible, it is ancillary and unrelated to establishing defendant Johnson's guilt.

{¶ 75} For example, Damon Johnson testified that at about three o'clock in the morning on January 22, hours after the shootings, he stopped at a gas station to "buy something." Coincidentally, Damon Johnson saw a person who looked like defendant Johnson pull up in a car, throw a garbage bag into the dumpster and speed away.

{¶ 76} As confirmed by Damon Johnson's testimony and the gas station surveillance video, he retrieved the garbage bag. Damon Johnson testified that he opened the bag and found a pair of boots "with what appeared to be a splatter on them." He turned the bag and its contents over to police later that morning. Forensic testing on the boots established that the "splatter" that Damon Johnson observed tested presumptively positive for blood, but whether it was and whose it was could not be confirmed.

{¶ 77} Defendant Johnson admitted that the boots were his and confirmed that it was he who threw them in the gas station dumpster. Nevertheless, these admissions notwithstanding, the evidence presented at trial established Johnson's guilt. Damon Johnson's testimony, incredible or otherwise, does not impact the evidence establishing guilt and cause it to be less believable. It is not evidence weighing heavily against conviction.

### iii. Lack of Physical Evidence

{¶ 78} Johnson claims that conviction is against the weight of the evidence because there is no "physical evidence" connecting him to Bandy and James' deaths. He asserts that none of his DNA or fingerprints were found in the apartment, no murder weapon was recovered traceable to him and the stain on his boots was not confirmed to be blood. "[A] lack of physical evidence, standing alone, does not render a defendant's conviction against the manifest weight of the evidence." *State v. Robertson*, 8th Dist. Cuyahoga No. 106279, 2018-Ohio-2934, ¶ 32, citing *State v. Payne*, 8th Dist. Cuyahoga No. 105965, 2018-Ohio-1399, ¶ 30; *see also State v. Lundy*, 8th Dist. Cuyahoga No. 90229, 2008-Ohio-3359, ¶ 12 (physical evidence was not required to corroborate witness' testimony); *State v. Jackson*, 7th Dist. Jefferson No. 09 JE 13, 2009-Ohio-6407, ¶ 15-16 (conviction based on victim's testimony identifying defendant as perpetrator was not against the manifest weight of the evidence despite the lack of physical evidence).

{¶ 79} Physical evidence aside, as previously discussed, there is strong circumstantial evidence in this case establishing Johnson's guilt. *See State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), at paragraph one of the syllabus ("Circumstantial evidence and direct evidence inherently possess the same probative value * * *."); *see also Brook Park v. Gannon*, 2019-Ohio-2224, 137 N.E.3d 701, ¶ 25 (8th Dist.), quoting *State v. Hawthorne*, 8th Dist. Cuyahoga No. 96496, 2011-Ohio-6078, ¶ 9 ("'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying, and persuasive than direct evidence.'").

{¶ 80} As Core testified, a man with an "offset" eye was in the lobby with a taller man. Johnson himself and the surveillance video confirmed this. Johnson and the man left the lobby together and immediately thereafter entered through a different entrance. Lemons and the video confirmed that he opened the door for Johnson and the other man. Moments later, as confirmed by the video and Southerland, Southerland descended the stairs and passed the two men as they were on their way up the stairs.

{¶ 81} It is true that Southerland did not identify Johnson. However, his testimony was clear that he passed two men "who were definitely bundled up," one of whom had a "lazy eye," ascending the stairs together. One of these men, according to other witnesses including Johnson, was, in fact, Johnson. Southerland was equally clear that he saw the same two men come back down the stairs and exit together approximately five to ten minutes later. Cunningham's account of the two men exiting together is similarly consistent.

{¶ 82} Finally, as discussed, Ballard was standing near the door and was close to the assailants when they entered the apartment. He observed the shorter man and described him to police as having a lazy eye. He also identified both assailants in the surveillance video.

{¶ 83} This is not the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* 78 Ohio St.3d at 387, quoting *Martin*, 20 Ohio App.3d at 175.

{¶ 84} We overrule the first assignment of error.

## 2. Suggestive Photo Array

{¶ 85} In the second assignment of error, Johnson claims that the trial court erred by denying his motion to suppress Ballard and Core's pretrial identifications because the photo array that was presented to them were unnecessary suggestive.

{¶ 86} We note that the record does not support Johnson's claim that both Core and Ballard selected him from the photo array. To the contrary, at the hearing on Johnson's motion to suppress, the state informed the court that it would not be introducing Core's identification at trial because "she did not make any picks." Moreover, review of the record reflects that Core's array was not introduced at trial and she made no in-court identification.

{¶ 87} Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St. 3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. Thus, we give deference to the trial judge's factual findings, but we review the application of law to the facts de novo. *Id.*

{¶ 88} Prior to suppressing identification testimony, a trial court must conduct a two-step analysis. *State v. Davis*, 8th Dist. Cuyahoga No. 101502, 2015-Ohio-1144, ¶ 19. First, the trial court must determine whether the identification procedures were so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. *Id.*, citing *State v. Monford*, 190 Ohio App. 3d 35, 2010-Ohio-4732, 940 N.E.2d 634, ¶ 38 (10th Dist.), and *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The defendant has the burden of

demonstrating that the procedures used were unnecessarily suggestive. *State v. Quarterman*, 8th Dist. Cuyahoga No. 99317, 2013-Ohio-4037, ¶ 26.

{¶ 89} Second, the trial court must determine whether the identification itself was unreliable under the totality of the circumstances. *Davis* at ¶ 19, citing *Monford* at ¶ 38. If the defendant fails to meet the first part of his or her burden, the court need not consider the totality of the circumstances under the second prong. *State v. Tate*, 2016-Ohio-5622, 70 N.E.3d 1056, ¶ 31 (8th Dist.), citing *State v. Green*, 117 Ohio App.3d 644, 691 N.E.2d 316 (1st Dist.1996). If the pretrial procedures were not suggestive, any remaining questions as to reliability go to the weight of the identification, not its admissibility. *Id.*

{¶ 90} Here, Johnson argues that the photo array was unnecessarily suggestive because he was the only individual pictured "with an eye defect of any kind." At trial there was testimony that the shorter man had an eye that was "definitely slanted," "offset" and "squinted." Witnesses, including Johnson himself also stated he had a "lazy eye."

{¶ 91} We find no merit to Johnson's argument. After reviewing the photo array, we disagree with Johnson's assertion that no other person pictured in the array "has anything remotely resembling a droopy eyelid" or "similar mild eye deformity." Johnson's eye "droop" may be more pronounced than the other individuals in the array, however, at least four other individuals appear to have an eye that is partially closed or otherwise exhibiting some manner of droop.

Accordingly, Johnson has failed to demonstrate that the photo array was unnecessarily suggestive.

{¶ 92} Nevertheless, even if Johnson was correct that he was the only person depicted with "droopy eyelid" or "similar mild eye deformity," that alone would not cause the array to be unnecessarily suggestive. *See State v. Bryson*, 8th Dist. Cuyahoga No. 98298, 2013-Ohio-934, ¶ 47, quoting *State v. Davis*, 76 Ohio St.3d 107, 112, 1996-Ohio-414, 666 N.E.2d 1099 ("'A defendant in a lineup need not be surrounded by people nearly identical in appearance.'"); *compare State v. Campbell*, 8th Dist. Cuyahoga No. 99807, 2014-Ohio-493, ¶ 23-24 (refusing to find photo array unduly suggestive where appellant was the only individual pictured with a tattoo); *compare State v. Butcher*, 11th Dist. Portage No. 2016-P-0062, 2018-Ohio-4943, ¶ 50 ("[T]he fact that appellant is the sole individual with a large blemish/tattoo [on the side of his face] does not render the photo array unduly suggestive."); *compare State v. Gaines*, 2016-Ohio-1312, 62 N.E.3d 708, ¶ 23 (11th Dist.) ("While only appellant had what some would consider 'true' dreadlocks, that fact alone did not make the array unduly suggestive."). A photo array is not unduly suggestive if the other people shown along with the defendant look "relatively similar in age, features, skin tone, facial hair, dress, and photo background * * *." *Bryson* at ¶ 43, quoting *State v. Jacobs*, 7th Dist. Mahoning No. 99-CA-110, 2002-Ohio-5240, ¶ 18.

{¶ 93} We overrule the second assignment of error.

### 3. Gruesome and Cumulative Photographs

{¶ 94} In the third assignment of error, Johnson argues that the trial court erred by admitting photographs into evidence that were "gruesome cumulative, and of limited if any probative value." Johnson challenges 19 photographs of Bandy's body taken during his autopsy and 20 photographs of James' body taken at the scene as well as during his autopsy.

{¶ 95} "The prosecution is entitled to present evidence showing the cause of death, even if the cause is uncontested, to give the jury an 'appreciation of the nature and circumstances of the crimes.'" *State v. Catron*, 8th Dist. Cuyahoga No. 101789, 2015-Ohio-2697, ¶ 25 quoting *State v. Chatmon*, 8th Dist. Cuyahoga No. 99508, 2013-Ohio-5245, ¶ 41. Moreover, the state has latitude in constructing its case and determining the manner by which it meets its burden of proof. *See State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 99, 103 ("[T]he state bears the burden of proof and it has no obligation to meet that burden in the *least* gruesome way.") (Emphasis sic.); *see also State v. Kirkland*, Slip Opinion No. 2020-Ohio-4079, quoting *State v. Maurer*, 15 Ohio St.3d 239, 265, 473 N.E.2d 768 (1984) ("'[T]he mere fact that a photograph is gruesome or horrendous is not sufficient to render it per se inadmissible.'").

{¶ 96} Ultimately, the rules of evidence govern the admissibility of the crime scene and autopsy photographs. *See State v. Rafter*, 8th Dist. Cuyahoga No. 106787, 2019-Ohio-529, ¶ 12 (in noncapital cases "we apply the usual rules of admitting evidence"). Evid.R. 403(A) dictates when a trial court must exclude evidence:

"[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(B) explains when a court is permitted to exclude relevant evidence: "if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence."

{¶ 97} Johnson did not object to any of these photographs being introduced at trial and he did not object to any of these photographs being admitted into evidence.[1] Therefore, Johnson has waived all but plain error on this issue. Crim.R. 52(B); *see also Catron* at ¶ 26.

{¶ 98} On appeal Johnson conclusively asserts, and in the absence of any explanation or support, that "many" photographs of Bandy and James are "prejudicial" and that "virtually all of them" are "needlessly cumulative." However, Johnson failed to identify any particular photograph as gruesome, cumulative or not probative and he fails to articulate any basis by which we can conclude as much. *See* App.R. 16(A)(7). As such, he has failed to demonstrate plain error on the record.

{¶ 99} Regardless, it bears mention that some of the autopsy photographs appear to have been wholly unnecessary. For example, where the state presented

---

[1] For completeness we note that Johnson filed a pretrial "motion in limine to exclude photographs of the deceased," in which he sought a hearing to "preview the State's photographs of the deceased" and an order preventing the state from "admitting any gruesome photographs into evidence." The court denied the motion, but, in so doing stated it "will limit the photographs to ensure the photographs admitted will be non-repetitive and are probative," and it ordered counsel to provide the court the photographs before opening statements.

photographs that showed the bullet entry wound at the back of Bandy's head, including multiple views of the entrance wound injury to his scalp, skull and brain, seen in exhibit Nos. 223, 224, 225, 228, 229, 230, 231, 232, 233, 234, 235 and 236, as well as the exit wound above his left eye as depicted in exhibit Nos. 222, 226 and 227, there does not seem to be any reason to also include exhibit No. 237, the graphic depiction of Bandy's excised brain, highlighting the path of the bullet which the medical examiner described as "basically, pulpified brain tissue." Nevertheless, Johnson failed to object and the state was not afforded opportunity to explain why such a photograph was necessary.

{¶ 100} We overrule this assignment of error.

**4. Court Costs**

{¶ 101} In the fourth assignment of error, Johnson argues that the trial court erred by denying his motion to waive court costs.

{¶ 102} R.C. 2947.23(A)(1) provides in relevant part that "[i]n all criminal cases * * * the judge * * * shall include in the sentence the costs of prosecution * * * and render a judgment against the defendant for such costs." Nevertheless, R.C. 2947.23(C) gives the court discretion to "waive, suspend, or modify the payment of the cost of prosecution * * * at the time of sentencing or at any time thereafter." *State v. Taylor*, Slip Opinion No. 2020-Ohio-3514, ¶ 7. The court may waive costs for indigent defendants, although it is not required to do so. *Id.* This court reviews the denial of a motion to waive costs for abuse of discretion. *State v. Hicks*, 8th Dist. Cuyahoga No. 105083, 2017-Ohio-8312, ¶ 11.

{¶ 103} Review of the record reflects that before Johnson was sentenced, he filed a motion seeking a waiver of fines and the imposition of court costs. He made no argument that he should not be required to pay the costs associated with the first and second trials and there is no suggestion in the record that the costs of the first two trials were assessed against him.

{¶ 104} The sentencing journal entry reflects that the court subsequently entered judgment against Johnson "in an amount equal to the costs of this prosecution." It does not contain a specific itemized bill. *See State v. Tyus*, 8th Dist. Cuyahoga No. 108270, 2020-Ohio-103, ¶ 18, citing *State v. Threatt*, 108 Ohio St. 3d 277, 2006-Ohio-905, 843 N.E.2d 164, ¶ 19 ("[T]he typical sentencing entry assesses unspecified costs, with the itemized bill generated at a later date."). As such, any claim that the court did in fact require him to pay costs associated with all three trials is premature. *See id.* at ¶ 19, citing *State ex rel. West v. McDonnell*, 139 Ohio St. 3d 120, 2014-Ohio-1563, 9 N.E.3d 1030, ¶ 7. ("[U]ntil the clerk attempts to collect or issues a certificate of judgment upon the imposed costs, any attempt to challenge the itemization process is generally deemed premature."). We will not decide whether the trial court abused its discretion by imposing costs related to Johnson's first two trials question is not properly before this court.

{¶ 105} Finally, Johnson argues that the court's "failure to waive costs was itself" an abuse of discretion based on his present and future ability to pay. However, a trial court is not required to consider a defendant's present or future ability to pay when ruling on motion to vacate, suspend, or modify court costs under R.C.

2947.23(C). *Taylor* at ¶ 11, 16 ("If present or future ability is a condition for retaining costs, it doesn't make much sense for it not to be a condition for imposing costs in the first place. But it plainly is not.") citing *State v. White*, 103 Ohio St.3d 580, 2004-Ohio-5989, 817 N.E.2d 39, at ¶ 8, and R.C. 2947.23(A)(1)(a).

**{¶ 106}** We overrule the fourth assignment of error.

**{¶ 107}** Judgment affirmed.

**{¶ 108}** We remand this case for a nunc pro tunc sentencing entry to reflect the correct offense and sentence as to each count of conviction.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

EILEEN A. GALLAGHER, PRESIDING JUDGE

RAYMOND C. HEADEN, J., and
MARY EILEEN KILBANE, J., CONCUR