[Cite as *State v. Graham*, 2021-Ohio-3199.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 109582 |
| v. | : | |
| SHAKIRA D. GRAHAM, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 16, 2021

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-637307-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Jeffrey M. Maver, Assistant Prosecuting Attorney, *for appellee.*

Cullen Sweeny, Cuyahoga County Public Defender, and Robert B. McCaleb, Assistant Public Defender, *for appellant.*

MARY EILEEN KILBANE, J.:

{¶ 1} Defendant-appellant Shakira D. Graham ("Graham") appeals from her convictions for aggravated murder, murder, aggravated robbery, aggravated

burglary, felonious assault, grand theft, and receiving stolen property. For the reasons that follow, we affirm.

**Factual and Procedural History**

{¶ 2} This case arises from the murder of 27-year-old Meshach Cornwall ("Cornwall") that occurred on or about December 17, 2018. In November 2018, Cornwall and his mother Jacquelyn Harrington ("Harrington") moved into a three-bedroom house in Garfield Heights, Ohio. Cornwall's bedroom was in the basement of the home, and Harrington's bedroom was in the attic. Cornwall and the defendant-appellant Graham had met on the dating application Plenty of Fish in late November 2018.

{¶ 3} On Friday, December 14, 2018, Harrington left to go out of town for the weekend with her sister, Jean Phillip ("Phillip"). When Harrington left the house that morning, Cornwall and Graham were spending time together in the basement. Harrington spoke to Cornwall over the weekend; the last time she spoke to him was around 6 p.m. on Sunday, December 16, 2018.

{¶ 4} About a week before Cornwall was murdered, Graham met Dontez Pace ("Pace") on Plenty of Fish as well. Graham and Pace had met up approximately five times, usually at Pace's house on Greyton Road in Cleveland Heights, but on occasion they had met at a motel. On December 15, 2018, Pace met Samantha Paige ("Paige") on Plenty of Fish as well. Pace and Paige spoke on the phone and made plans to meet in person the next day. Pace and Graham were together during this phone call, and Pace put Graham on the phone to talk to Paige. According to Paige,

she was happy to learn that Graham would be present for her first meeting with Pace because having another woman there made her more comfortable.

{¶ 5} On December 16, 2018, Graham and Pace met at a motel and then took a rideshare to Pace's house. Later that day, Paige came to the house to meet Pace for the first time in person. Paige, Pace, and Graham were drinking and doing drugs together in the house Pace shared with his roommate, Jerome Matthews ("Matthews.") At some point, Paige, Pace, and Graham began to engage in sexual activity together. Eventually, Pace and Graham got into an argument and Graham got dressed and began to leave. Paige asked Graham if she could leave with her, and Graham responded "you don't want to go with me to do this." Graham called Cornwall for a ride and left the house.

{¶ 6} Cornwall worked at a car rental company near the airport, and on December 16, 2018, he worked until approximately 11 p.m. According to text messages and phone calls between Graham and Cornwall, Cornwall picked up Graham from the Greyton Road house after his December 16 shift and drove them back to his house in Garfield Heights. Sometime in the early morning hours of December 17, 2018, Cornwall was fatally shot four times in his basement.

{¶ 7} According to Matthews, Paige, and Pace, Graham returned to the Greyton Road house later that night. Graham returned to the house in a gold 2009 Honda Accord. At trial, Matthews testified that Graham had driven back to the house in a vehicle she had not had earlier in the day; Paige also described Graham returning in a vehicle and holding car keys. Matthews testified that when Graham

returned, she had a bottle of Tito's vodka and a jar of marijuana. Pace testified that when Graham returned, he thought she had probably "went out and made some money."

{¶ 8} Matthews's friend Chris Hubbard ("Hubbard") was also at the house when Graham returned. At trial, he testified that Graham knocked on the door and entered the house carrying a bottle of liquor, a gaming system, and some other large items. According to Hubbard, Graham also had two guns in wooden boxes and was trying to sell them.

{¶ 9} Matthews, Graham, and Hubbard resumed drinking and smoking marijuana, and eventually Matthews and Graham left together to buy drugs and get a motel room. Paige testified that she did not see or speak to Graham after Graham left the house the second time. Matthews's drug dealer dropped off Matthews and Graham at the Cleveland Motel on Euclid Avenue shortly before 8 a.m. on December 17, 2018, and Matthews rented a room. At trial, the state introduced evidence corroborating this, including Matthews's receipt from the motel and surveillance footage showing Matthews and Graham outside of the motel. Later in the morning on December 17, Matthews took car keys from Graham and walked home from the motel to buy more drugs. After buying cocaine and doing cocaine in his kitchen with Hubbard, Matthews drove back to the motel in the vehicle Graham had driven to his house the previous night. Matthews observed a broken computer and some wires in the backseat of the car.

{¶ 10} Matthews testified that he assumed that Graham had robbed someone the night before. After he returned to the motel room, he overheard a phone conversation between Graham and her mother. Matthews said that Graham had multiple cellphones in the motel room, and she gave him one to use. When Matthews left the motel, he took the cellphones and the jar of marijuana from Graham. Matthews testified that he intended to sell the phones and marijuana, and he ultimately took the phones to Walmart to sell on December 18, 2018. At Walmart, he turned in the phones in exchange for cash, and a Walmart employee took his photo and scanned his ID. Matthews did not speak to Graham again after leaving her in the motel room.

{¶ 11} Harrington returned home around noon on December 17, 2018. Her nephew picked up Harrington and Phillip from the airport and drove them to Harrington's Garfield Heights home. Harrington walked through her side door, which opened to the basement stairway and a stairway up into the kitchen. When Harrington walked through the door, she observed Cornwall laying on the floor at the foot of the basement steps. Initially, Harrington thought he had fallen, so she ran down the steps toward him. Seeing the blood around her son's body, Harrington ran back upstairs and out of the house, screaming that he was dead. Harrington's nephew went inside to confirm that Cornwall was dead, and Harrington and Phillip called 911.

{¶ 12} Harrington testified that while she did not notice many details about the scene after she discovered her son's body, she did not observe any signs of forced

entry. Over the next few days, Harrington realized that several things were missing from the home, including Cornwall's guns, his video game console, approximately $200 worth of marijuana, and her gold 2009 Honda Accord that Cornwall regularly used.

{¶ 13} Officer Matthew Krejci ("Officer Krejci") responded to the scene and entered the home with fire department personnel who had also arrived at the scene. Officer Krejci observed Cornwall's body at the bottom of the stairs, noticed that there was at least one visible gunshot wound on the body, and determined that he was deceased. Officer Krejci then cleared the area to prevent contamination of the scene.

{¶ 14} Detective Carl Biegacki ("Biegacki") and Lieutenant Robert Petrick ("Petrick") of the Garfield Heights Police Department also responded to the scene. Biegacki and Petrick inspected the exterior of the house for evidence and called additional detectives to the scene. The detectives canvassed the neighborhood to determine if anyone had seen or heard anything related to the murder, or if there was any relevant surveillance footage that might aid in the investigation.

{¶ 15} Biegacki interviewed Harrington in an attempt to learn more about Cornwall and further the investigation. Biegacki learned that other items were missing from the home, including a Vizio computer, an Xbox, and two firearms. In the course of his investigation, Biegacki also confirmed that Cornwall had worked his shift on December 16, 2018, and had punched out and left work around 11 p.m. Surveillance footage showed Cornwall driving nearby his house shortly after midnight on December 17, 2018. Harrington told Biegacki that Graham had been

in the house with Cornwall the morning she left, and a friend of Cornwall's subsequently provided the detective with Graham's Facebook page. Detectives also confirmed that Cornwall had been scheduled to work on December 17, but he did not show up for his shift that day.

{¶ 16} Upon identifying Graham, Biegacki attempted to locate her and went to her house in Shaker Heights, Ohio in the afternoon on December 17, 2018. Graham was not home, and Biegacki spoke to her mother, who provided him with Graham's phone number. Ultimately, Biegacki interviewed Graham the next day, December 18, 2018. This interview was recorded, and the state introduced the recorded interview as evidence at trial. In her interview, Graham told detectives that the last time she had seen Cornwall was Friday morning, December 15, 2018. Graham also stated that Cornwall was not her boyfriend and identified another person, Jeremy Collins ("Collins"), as her boyfriend.

{¶ 17} As part of the investigation, Biegacki subpoenaed Graham's phone records and obtained a search warrant for relevant cell tower records. The state introduced numerous text messages between Cornwall and Graham in which Graham referred to Cornwall as her boyfriend. Graham also sent Cornwall text messages with the address of the house on Greyton Road, telling him that she was waiting for him to pick her up. Phone records showed numerous calls from Graham to Cornwall throughout the evening on December 16, with the last two being made at 11:07 p.m. and 11:43 p.m. After these calls, Graham made numerous very short calls to Pace and several calls to Collins in the early morning hours of December 17.

{¶ 18} As for the missing gold Honda Accord, detectives received information on December 18, 2018, that the vehicle had possibly been located on Willowhurst Road in Cleveland. Petrick and Biegacki responded to that location and observed the vehicle. Upon confirming that it was the vehicle missing from the crime scene, the vehicle was taken into police custody. While the detectives located the vehicle, they learned that there was surveillance footage of the area and it was subsequently collected as part of the investigation. Surveillance footage from a residence near where the car was found showed a man park the car around 10:30 p.m. on December 17, 2018, and walk down the street toward Euclid Avenue. Using surveillance footage from a convenience store and the Cleveland Motel, detectives learned that the man walked from the car to the motel and entered a room. They were then able to obtain records from the motel, identify the man as Matthews, and confirm that he had checked into the motel with Graham.

{¶ 19} On December 18, 2018, credit cards belonging to Cornwall were found near the corner of Monticello and Cleveland Heights Boulevard in Cleveland Heights. Detectives also learned that Matthews had turned in two cellphones at a Walmart store in exchange for cash and subsequently confirmed that one of the phones had belonged to Cornwall; the other phone was too damaged to retrieve any information or confirm its ownership. On December 24, 2018, detectives learned that someone was using Cornwall's Xbox account and attempted to recover the Xbox, but they were unable to track the IP address. Detectives were also unable to recover the stolen firearms.

{¶ 20} As part of the investigation, Biegacki interviewed Matthews, who admitted to having the cellphones and driving the stolen vehicle. As a result of his involvement with this case, Matthews subsequently pleaded guilty to receiving stolen property in a separate case.

{¶ 21} Special Agent Daniel Boerner ("Boerner") with the Ohio Bureau of Criminal Investigation ("BCI") also responded to the scene on December 17, 2018. Boerner took photographs of the scene as he found it and collected physical evidence from the scene. Boerner also prepared a report based on his investigation of the crime scene. At trial, Boerner testified that there were no signs of forced entry at any of the doors or windows of the home or garage. Boerner collected evidence in the driveway, including a fake fingernail, broken pieces of glass that appeared to be from a cellular phone or other electronic device, and a cigarette butt. Boerner also collected evidence from inside the house, including multiple 40-caliber cartridge cases in the basement bedroom found near Cornwall's body, wine glasses, plastic cups, and a beer bottle.

{¶ 22} Boerner also executed a search warrant on the vehicle recovered from Willowhurst Road. Based on what he saw processing the vehicle, Boerner testified that he did not believe the vehicle had been broken into. An unfired 9-millimeter Luger bullet and a laptop were found in the trunk, and a USB plug and computer monitor with a broken screen was found in the backseat. Fingerprints on the computer monitor recovered from the vehicle were subsequently tested, but the results were insufficient to determine their source.

{¶ 23} Emily Feldenkris ("Feldenkris"), a forensic scientist in the DNA section of BCI, subsequently tested numerous items collected from the crime scene and the vehicle for DNA and prepared three reports related to her investigation in this case. Feldenkris compared DNA swabs from various items with DNA samples from Cornwall and Graham. Feldenkris testified that the DNA sample collected from the mouth of a wine glass found in the basement room was consistent with DNA contributions from both Cornwall and Graham. She went on to testify that both the fake fingernails found in the driveway and the basement and a sample collected from a beer bottle found in the basement were consistent with DNA contributions from Graham. Feldenkris testified that the DNA collected from the front interior passenger door handle of the vehicle was also consistent with Graham. There was no evidence that Matthews had contributed DNA to any of the evidence recovered from Cornwall's home.

{¶ 24} Matthew White ("White"), a firearm and toolmark examiner with BCI, examined fired cartridge cases, fired bullets, and various bullet fragments in connection with this investigation and prepared a report. White concluded that the four cartridge cases recovered from the basement were fired from the same 40-caliber firearm.

{¶ 25} David Dolinak, M.D., ("Dolinak"), a deputy medical examiner at the Cuyahoga County Medical Examiner's Department, went to the scene with an investigator from the medical examiner's office. Dolinak subsequently conducted an autopsy and prepared an autopsy report. During the state's direct examination

of Dolinak at trial, the state introduced 141 photos and Dolinak referred to the photos throughout his testimony.

{¶ 26} Based on his observations and photographs taken at the scene and the autopsy, Dolinak testified that Cornwall had four gunshot wounds: one in his head, one in his scalp, one in his shoulder, and one in the right side of his chest. With respect to the head wound, Dolinak testified that the bullet traveled from the back of Cornwall's head to the front at a downward angle from the right side of his head to the left. The bullet fractured Cornwall's skull and traveled through his brain stem, cerebellum, carotid artery, and the left side of his face before coming out of the skin over his jaw. Dolinak testified that this injury would have rendered Cornwall unconscious almost immediately, and he likely died shortly after sustaining this wound. With respect to the scalp wound, Dolinak testified that based on a torn tuft of the gray basement carpet and a tuft of grayish material in the wound, it is likely that the wound was caused by a fragment of a bullet ricocheting off of the basement carpet and into Cornwall's scalp. With respect to the shoulder wound, Dolinak testified that the bullet that caused that wound traveled sharply downward from Cornwall's right shoulder through his chest and abdomen, including his collarbone, heart, and multiple organs and arteries. Dolinak testified that this wound caused significant internal bleeding, and while it would not necessarily have immediately incapacitated Cornwall, he would have quickly died after sustaining this injury. Finally, with respect to the chest wound, Dolinak testified that the bullet entered

Cornwall's body in the right side of his chest and traveled out the left side of his body, through both kidneys and his spine.

{¶ 27} Cornwall also had several superficial fragmentary projectile injuries that Dolinak stated were probably caused by a fragmented bullet. Dolinak testified that the injuries likely occurred close in time to each other and, based on the absence of gunpowder residue on the body, they were likely fired from a gun at least three feet away from Cornwall. Ultimately, as a result of the autopsy, Dolinak determined that Cornwall died as a result of the gunshot wounds he sustained and concluded that the manner of death was homicide.

{¶ 28} Daniel Mabel ("Mabel"), a forensic scientist in the trace evidence department of the Cuyahoga County Medical Examiner's office, prepared a trace evidence laboratory examination report related to his examination of Cornwall. Mabel testified that Cornwall's right hand tested positive for gunshot residue. Mabel explained that while a number of scenarios can result in someone having gunshot residue on their hands, the result in this case was likely a consequence of Cornwall's body being discovered holding a live round of ammunition in his right hand.

{¶ 29} Finally, Special Agent Jacob Kunkle ("Kunkle") of the Federal Bureau of Investigation also participated in the investigation into Cornwall's murder. Kunkle was a member of the FBI's Cellular Analysis Survey Team ("CAST"), which specializes in historical record analysis of cellphone data. Based on his analysis of Cornwall's cellphone activity, Kunkle testified that his phone was in the Brookpark area around 11 p.m. on December 16, 2018, traveled up to the Greyton Road area,

and then traveled down to the Garfield Heights area between 12:14 and 12:56 a.m. on December 17. Likewise, based on his analysis of Graham's cellphone activity, Kunkle testified that her phone was in the Greyton Road area between 11:03 and 11:34 p.m. on December 16, 2018, traveled south towards Cornwall's house, and was in the area of Cornwall's house around 12:45 a.m. on December 17, 2018.

{¶ 30} As a result of the investigation into Cornwall's December 2018 death, on March 8, 2019, a Cuyahoga County Grand Jury indicted Graham on one count of aggravated murder in violation of R.C. 2903.01(A), one count of aggravated murder in violation of R.C. 2903.01(B), one count of aggravated robbery in violation of R.C. 2911.01(A)(3), one count of aggravated burglary in violation of R.C. 2911.11(A)(1), one count of murder in violation of R.C. 2903.02(B), one count of felonious assault in violation of R.C. 2903.11(A)(1), one count of grand theft in violation of R.C. 2913.02(A)(1), and one count of receiving stolen property in violation of R.C. 2913.51(A). With the exception of the receiving stolen property charge, each charge carried one- and three-year firearm specifications.

{¶ 31} Graham pled not guilty to these charges. After Graham twice executed a waiver of her right to a speedy trial, first on August 12 and then November 6, 2019, the case ultimately proceeded to a jury trial on February 19, 2020.

{¶ 32} At trial, the state called Matthews, Paige, Pace, and Hubbard to testify, as well as the aforementioned officials who had been involved in the investigation. As discussed above, the state also introduced evidence in the form of

text messages and other cellphone records, motel records, surveillance footage, photographs of the scene and Cornwall's body, and ballistics evidence. At the close of the state's case, Graham's counsel moved for a Crim.R. 29 dismissal. The court denied this motion. Graham's counsel did not call any witnesses, renewed the Crim.R. 29 motion, and the court again denied this motion.

{¶ 33} On March 1, 2020, the jury found Graham not guilty of aggravated murder in violation of R.C. 2903.01(A) but guilty of the lesser included offense of murder in violation of R.C. 2903.02(A). The jury found Graham guilty of all other counts and specifications, including aggravated murder in violation of R.C. 2903.01(B).

{¶ 34} On March 4, 2020, the trial court sentenced Graham to life in prison with parole eligibility after 25 years on the aggravated murder count and 18 months in prison each on the grand theft and receiving stolen property counts, to run concurrently. The remaining counts were merged for sentencing.

{¶ 35} On March 6, 2020, Graham appealed, presenting three assignments of error for our review:

> I. The trial court erred in permitting the prejudicial and cumulative presentation of extremely gruesome photographs.
>
> II. Ms. Graham's trial counsel rendered constitutionally ineffective assistance of counsel when he failed to object to the presentation or admission into evidence of over one hundred unnecessary and prejudicial gruesome photographs.
>
> III. Ms. Graham's convictions were against the manifest weight of the evidence.

**Legal Analysis**

**I. Photographs**

{¶ 36} In her first assignment of error, Graham argues that the trial court erred in permitting the prejudicial and cumulative presentation of extremely gruesome photographs. Specifically, Graham argues that the state's introduction of over 100 photographs of Cornwall's remains were not necessary to prove any element of the offenses with which Graham was charged, and Graham's defense was prejudiced by such a large volume of gruesome photographs.

{¶ 37} Evid.R. 403 governs the exclusion of relevant evidence on grounds of prejudice, confusion, or undue delay, and provides:

(A) **Exclusion mandatory.** Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

(B) **Exclusion discretionary.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence.

{¶ 38} Under Evid.R. 403, "the admission of photographs is left to the sound discretion of the trial court." *State v. Maurer*, 15 Ohio St.3d 239, 264, 473 N.E.2d 768 (1984), citing *State v. Wilson*, 30 Ohio St.2d 199, 203-204 (1972). Further, while a court may reject an otherwise admissible photograph if it is more prejudicial than probative, the Ohio Supreme Court has held that "the mere fact that a photograph is gruesome or horrendous is not sufficient to render it *per se*

inadmissible."  *Id.*, citing *State v. Woodards*, 6 Ohio St.2d 14, 25, 215 N.E.2d 568 (1966).

{¶ 39} While the admission or exclusion of relevant evidence rests within the sound discretion of the trial court, where, as here, the defendant fails to object to evidence, this constitutes a waiver of all but plain error.  *State v. Herron*, 8th Dist. Cuyahoga No. 99110, 2013-Ohio-3139, ¶ 17, citing *State v. Loza*, 71 Ohio St.3d 61, 75, 641 N.E.2d 1082 (1994).  Pursuant to Crim.R. 52(B), "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."  However, """notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."""  *State v. Black*, 2019-Ohio-4977, 149 N.E.3d 1132, ¶ 21 (8th Dist.), quoting *State v. Mallory*, 8th Dist. Cuyahoga No. 106052, 2018-Ohio-1846, ¶ 17, quoting *State v. Long*, 53 Ohio St.2d 91, 93, 372 N.E.2d 804 (1978), paragraph two of the syllabus.

{¶ 40} In criminal prosecutions, the state "is free to choose amongst available options as to how to present evidence in support of its case."  *State v. Williams*, 7th Dist. Mahoning No. 98 CA 74, 2000 Ohio App. LEXIS 1233, 32 (Mar. 20, 2000).  Recognizing this, Ohio courts have found that photographs may be used for a wide variety of purposes, including corroborating witness testimony,

establishing the intent of the accused, and showing the nature and circumstances of the crime. *State v. Jalowiec*, 91 Ohio St. 3d 220, 230, 744 N.E.2d 163 (2001).

{¶ 41} Here, the photographs were presented by the state during Dolinak's testimony and served as an illustration of the medical examiner's thorough explanation of the various injuries Cornwall suffered. The photographs showed both Cornwall's injuries and how Cornwall's body was discovered. Graham argues that because there was no dispute as to Cornwall's cause of death, these photos served no purpose other than to disgust the jury and inflame its passions. We acknowledge that at trial, there was never any dispute as to the fact that Cornwall died as a result of being shot four times. Our review of the record, however, and in particular Dolinak's testimony, shows that Graham's counsel did attempt to create reasonable doubt as to the identity of the shooter. Defense counsel attempted to do so by questioning whether someone of Graham's height could have inflicted the injuries given the downward trajectory of the bullets. Because the photographs showed the trajectory of the bullets through Cornwall's body, and in some cases the location of shell casings with respect to his body, we agree with the state that they likely aided the jury in understanding witness testimony regarding the potential location of the shooter. Because Graham has not satisfied the extremely high burden of demonstrating plain error, her first assignment of error is overruled.

{¶ 42} Although we have concluded that the admission of numerous photos of the victim into evidence in this case did not amount to plain error, we nevertheless are compelled to reiterate the Ohio Supreme Court's statement "strongly

[cautioning] judicious use of this type of evidence so that any question of probative value, as compared to cumulative, repetitious and prejudicial effects, will be avoided." *State v. Morales*, 32 Ohio St.3d 252, 259, 513 N.E.2d 267 (1987). In a recent case addressing the issue of gruesome and cumulative photographs, this court found that regardless of the appellant's failure to demonstrate plain error, "it bears mention that some of the autopsy photographs appear to have been wholly unnecessary." *State v. Johnson*, 8th Dist. Cuyahoga No. 109041, 2020-Ohio-5255, ¶ 99. Despite being unable to find any reason to include particular photographs, we found in *Johnson* that because the defendant failed to object, the state was not afforded the opportunity to explain why potentially cumulative photographs were necessary. *Id.* We reach the same conclusion in this case.

## II. Ineffective Assistance of Counsel

**{¶ 43}** In Graham's second assignment of error, she argues that her trial counsel rendered constitutionally ineffective assistance of counsel when he failed to object to the presentation or admission into evidence of over 100 unnecessary and prejudicial gruesome photographs.

**{¶ 44}** To succeed on an ineffective assistance of counsel claim, the appellant must show that her trial counsel's performance was deficient and that the deficient performance prejudiced her defense. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 205, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice is established when the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different." *Strickland* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

{¶ 45} As discussed in our analysis of Graham's first assignment of error, the admission of the photographs in this case aided a critical witness in providing thorough testimony as to the cause of the victim's death and likely provided a helpful illustration of the victim's injuries and the crime scene for the jury. Therefore, even if defense counsel had objected to the admission of the photographs, there is not a reasonable probability that such an objection would have been sustained. Because the admission of the photographs was within the trial court's discretion, it cannot be said that the failure to object to the photographs was deficient. In the absence of a showing that her counsel's decision not to object to the photographs was deficient, she has not satisfied the first prong of the *Strickland* test.

{¶ 46} Furthermore, even if the court had sustained an objection to the photographs, Graham has not satisfied the second prong of the *Strickland* test showing that the outcome of the proceedings would have been different. In light of the overwhelming evidence against Graham, as will be discussed more fully below, we cannot conclude the outcome of the proceedings would have been different — that Graham would not have been convicted — without the introduction of the photographs into evidence. Finally, we note that while Graham asserts that the state's introduction of photographs interfered with her defense, Graham did not call

any witnesses or present any evidence.  Therefore, we overrule Graham's second assignment of error.

## III. Manifest Weight of the Evidence

{¶ 47} In Graham's third and final assignment of error, she asserts that her convictions were against the manifest weight of the evidence.  Specifically, Graham argues that the state's evidence was largely circumstantial and ultimately rested on untrustworthy testimony from witnesses who had been intoxicated at the time of the relevant incidents in this case.  Graham also argues that no physical evidence of "substantive significance" was recovered connecting Graham to the crime.

{¶ 48} A manifest weight challenge attacks the quality of the evidence and questions whether the state met its burden of persuasion at trial.  *State v. Hill*, 8th Dist. Cuyahoga No. 99819, 2014-Ohio-3598, ¶ 25, citing *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-387, ¶ 13.  When reviewing a manifest weight challenge, a court reviews the entire record, weighing all evidence and reasonable inferences and considering the credibility of the witnesses, to determine whether the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed.  *State v. Thompkins*, 78 Ohio St.3d 380, 387, 78 N.E.2d 541 (1997).

{¶ 49} Although we consider credibility when reviewing a manifest weight challenge, "issues relating to the credibility of witnesses and the weight to be given are primarily for the trier of fact."  *State v. Matthews*, 8th Dist. Cuyahoga No. 97916, 2012-Ohio-5174, ¶ 34, citing *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356

(1982), and *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Further, the trier of fact is free to believe all, part, or none of the testimony of each witness. *Id.*, citing *State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist.1992). Therefore, appellate courts will generally defer conflicts in the evidence to the trier of fact who had the opportunity to hear witnesses and observe their demeanor. *Id.*, citing *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986).

{¶ 50} Having reviewed the entire record, including the trial transcript and the evidence, we cannot conclude that this is the exceptional case in which the jury lost its way and created a manifest miscarriage of justice. With respect to Graham's arguments about the general untrustworthiness of the witnesses, we do not find this argument convincing. The testimony from Matthews, Paige, Pace, and Hubbard is all corroborated by each other's testimony and the testimony of the other witnesses. Further, their testimony is corroborated by the physical and documentary evidence the state introduced, including surveillance footage and receipts from the Cleveland Motel and Walmart. Additionally, each of these four witnesses was open about things that might have impacted their credibility in the eyes of the jury: Matthews testified about his lengthy criminal history, Paige testified about her substance abuse issues, and Pace testified as to his promiscuous lifestyle. The jury was able to consider all of these factors when assessing the witnesses' credibility.

{¶ 51} Graham emphasizes the inconsistencies between Matthews's, Paige's, Pace's, and Hubbard's recollection of the items Graham had when she returned to

the Greyton Road house. While it is true that the four witnesses described slightly different items, the descriptions were largely consistent. Multiple witnesses noted that Graham returned in a car she had not had earlier in the day, and multiple witnesses noted that she was carrying a bottle of liquor. Hubbard testified that Graham returned with guns and a gaming system, and Matthews testified that she returned with marijuana. Further, multiple witnesses testified that for various reasons, they believed that Graham had robbed someone before returning to the house.

{¶ 52} Graham's DNA was found in Cornwall's basement bedroom. Cellphone records indicated that Cornwall and Graham were together at the approximate time of his death, and surveillance footage, documentary evidence, and witness testimony established that Graham stole the victim's car and other belongings shortly after his death. Viewing the evidence in its totality and making all reasonable inferences, we cannot conclude that the jury lost its way in concluding that Graham murdered Cornwall and stole his car and other belongings. For these reasons, Graham's third assignment of error is overruled.

{¶ 53} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's

conviction having been affirmed, any bail pending is terminated.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

EILEEN A. GALLAGHER, P.J., and
EILEEN T. GALLAGHER, J., CONCUR.