[Cite as *State v. Silver*, 2025-Ohio-2771.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                            No. 114499

    v.                                  :

TERRELL SILVER,                         :

    Defendant-Appellant.         :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 7, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-680442-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kevin R. Filiatraut, Assistant Prosecuting Attorney, *for appellee.*

Joseph V. Pagano, *for appellant.*

SEAN C. GALLAGHER, J.:

{¶ 1} Terrell Silver appeals his convictions stemming from the execution-style murders of Dejuan Willis, Aiyanna Quitman, Christopher Monroe, and Jazmyne Lawson and her unborn child, and the unrelated attempted murder and felonious assault of another victim ("James") that occurred a month after the

slayings. In addition to five consecutive life terms with no possibility of parole, Silver was sentenced to serve 30.5 years on the definite terms imposed for the firearm specifications and underlying non-life counts. For the following reasons, we affirm those convictions.

{¶ 2} The trial involved circumstantial evidence tying Silver to the weapons used in both crimes. But by and large, the State based its case on Silver's braggadocious confession to a prison cellmate and James's certitude in identifying Silver as his shooter.

{¶ 3} The investigation into the murders began in September 2019 when a concerned citizen reported his belief that there were four dead bodies in an abandoned house in the East 144th Street neighborhood of Cleveland. That person knew Monroe to stay at the abandoned house there and that he often dealt drugs at a nearby bus stop. Officers investigated the tip and found the bodies of Willis, Quitman, Monroe, and Lawson in the house. An autopsy revealed Lawson was in her second trimester of pregnancy.

{¶ 4} By the time officers found the bodies, they were decomposed beyond facial recognition. The victims were later identified by other means. Investigators recovered a .25-caliber pistol, a .40-caliber shell casing, and eleven 9 mm shell casings in the room where the bodies lay. Several 9 mm bullets were also recovered. Willis and Monroe were shot at least five times each. Quitman was shot at least 11 times and Lawson at least six.

{¶ 5} Another witness, once Silver's roommate, testified that Monroe had altercations with Silver in the days leading up to the shooting. Silver came home one night looking for his handgun because, as he told the witness, he had just been ambushed by Monroe at the same bus stop where reportedly he sold drugs. The witness stated that Silver fired shots at Monroe and Willis as they fled the scene. Approximately 10-15 minutes later, Monroe, Willis, Quitman, and Lawson walked by the witness's home, heading toward the abandoned house where their bodies were eventually found.

{¶ 6} A few weeks after police discovered the bodies, James filed a police report stating his belief that Silver was involved in the slayings. Not long after filing that report, James called 9-1-1 to say that he spotted Silver as he was entering a vehicle with someone else. As James explained the unfolding situation to the dispatcher, he was shot by Silver, whom James identified at trial. The weapon involved in that shooting was an unrecovered .40-caliber firearm, which was the same .40-caliber weapon tied to the shell casing discovered in the room where the murder victims' bodies were found. During trial, James blurted out that he had been told that Silver murdered the four people based on the information he heard from his deceased friend. That unsolicited statement was the subject of extended discussions and objections.

{¶ 7} In July 2020, police officers responded to an unrelated shooting event on East 158th Street. A 9 mm Taurus handgun was confiscated and an unrelated individual was arrested. That individual told officers he obtained the Taurus from

his nephew, who recently died of a drug overdose. Investigators were unable to find any connection between either of them and the murders or the bus-stop shooting. The Taurus firearm was sent for ballistic testing. It was determined that all the 9 mm shell casings and bullets from the murder scene were fired from it, including the bullets recovered from the murdered victims. Forensic testing revealed that Silver's blood was on the magazine chamber of the Taurus handgun, which is the inside part of the handgrip where the ammunition magazine is inserted.

{¶ 8} In addition to the circumstantial evidence linking Silver to the murders, the State also presented Silver's admissions to a cellmate. The cellmate began serving a sentence for aggravated rioting in December 2019. He was assigned to share a cell with Silver. According to the cellmate, Silver bragged about his ranking in the Heartless Felons gang and disclosed his criminal activity, including details about the murders. Silver relayed to the cellmate that he shot Monroe and Willis in retaliation for their shooting at him at the bus stop while Silver was unarmed. Silver explained to the cellmate that Monroe and Willis heard that he was looking for retribution, so they asked around for ammunition because they had none. Silver took that opportunity to find the two men. As he told his cellmate, after entering the room in the abandoned building, Silver saw the four people and just began shooting because "he had to do what he had to do."

{¶ 9} In this appeal, Silver advances six assignments of error, many of which are related. Each will be addressed but reordered and consolidated where appropriate.

{¶ 10} In the first, second, and fifth assignments of error, Silver challenges the admissibility of various aspects of James's and one of the investigating officer's trial testimonies.

{¶ 11} During trial, the prosecutor asked James whether he called 9-1-1 because he "thought [these two people] were involved in the murder of those four people . . . ?" James responded that it was not just a "thought," because "the dude that's dead, his cousin's dead, too, and she the one that told me. She's dead too. Her name was Isha." Tr. 1425:10-21. That statement does not directly incriminate Silver but demonstrates that James lacked firsthand information regarding the murders.

{¶ 12} James's 9-1-1 recording was also admitted into evidence beginning with the dispatcher. The trial court concluded that the call was made in response to an ongoing emergency and James was simply telling the dispatcher why he believed he was in danger — being shot by someone James believed to be involved in a depraved murder. With respect to James's 9-1-1 statements and trial testimony, the trial court instructed the jury as follows:

> James testified yesterday. You will not consider that Mr. James thought Terrell Silver was the person who shot DeJuan Willis, Aiyanna Quitman, Christopher Monroe, or Jazmyne Lawson as evidence of his guilt to counts related to those victims as he testified that he did not have firsthand knowledge of it.
>
> You may only consider his testimony for the limited purpose of his actions in conjunction with all the events that occurred on October 1, 2019, and the associated testimony and exhibits together with all of the other testimony and exhibits in this case.

Tr. 1470:23-1471:10.

{¶ 13} In addition, one of the police officers testified to the various nicknames of the victims and Silver that he learned during the course of the investigation. The trial court admitted the testimony not for the truth of the matter asserted, but to explain the course of the officer's investigation.

{¶ 14} Silver claims that those statements violated the Confrontation Clause of the Sixth Amendment of the federal constitution and were inadmissible because the statements were not based on personal knowledge or were otherwise hearsay.

{¶ 15} All of the challenged evidence and testimony was admitted in a limited capacity. We must start with the presumption that the limiting instructions provided by the trial court mitigated the danger of any unfair prejudice in focusing the jury's attention on the admissible aspects of the testimony. *See Samia v. United States*, 599 U.S. 635, 646 (2023) ("[O]ur legal system presumes that jurors will 'attend closely the particular language of [such] instructions in a criminal case and strive to understand, make sense of, and follow' them."), quoting *United States v. Olano*, 507 U.S. 725, 740 (1993). "Generally, this type of instruction ensures that the jury will consider evidence of limited admissibility for its admissible purpose rather than its inadmissible purpose." *State v. Ricks*, 2013-Ohio-3712, ¶ 49, citing Evid.R. 105 (French, J., concurring in judgment only). Silver has not addressed the impact of the limiting instructions on anything but his Confrontation Clause argument.

{¶ 16} Silver's state-evidentiary-rule arguments, lack of personal knowledge or hearsay, do not address the purposes of the evidence as admitted. For example,

Silver claims the statements of James and the officer violated the rule against hearsay, despite the fact the evidence was not admitted for the truth of the matter asserted. He instead focuses on the inadmissible aspects of the testimony while ignoring the fact that the testimony was limited through the trial court's instruction to only consider it for the limited, admissible purposes.

{¶ 17} James's statements regarding his belief of Silver's culpability were limited to his reason for calling 9-1-1 before being shot and were not being offered for the truth of who committed the murders. *See* Evid.R. 801(C). The officer's testimony regarding the nicknames was solely for the purposes of the course of his investigation. *State v. Gray*, 2023-Ohio-215, ¶ 21 (8th Dist.) (string citing cases establishing that an officer's testimony explaining the reasons for investigating certain suspects is not hearsay). Although limiting instructions will not always cure the admission of prejudicial evidence, we have not been provided any discussion or analysis as to why the presumption that the limiting instruction was appropriate and followed by the jury would not apply in this particular case.

{¶ 18} With respect to the Confrontation Clause issue, Silver claims that James's testimony regarding the source of his knowledge infected his statements in the 9-1-1 recording and therefore violated the Confrontation Clause, under the standard established in *Crawford v. Washington*, 541 U.S. 36 (2004). According to Silver, James's statements directly identified Silver as the murderer based on secondhand information from a nontestifying witness.

{¶ 19} Silver, however, makes no attempt to demonstrate that any of the statements in the 9-1-1 recording are testimonial in nature — he simply presumes that legal conclusion. In general, not all statements made to a 9-1-1 dispatcher are testimonial in nature. *See Michigan v. Bryant*, 562 U.S. 344, 355 (2011); *Davis v. Washington*, 547 U.S. 813, 827 (2006). Further, statements between two third-party individuals implicating a defendant are generally not considered to be testimonial under the *Crawford* analysis. *United States v. Gibson*, 409 F.3d 325, 338 (6th Cir. 2006). Silver has not demonstrated that the Confrontation Clause was implicated by James's trial testimony or statements to the 9-1-1 dispatcher regarding his belief as to Silver's involvement in the murders.

{¶ 20} Nevertheless, Silver believes that because James admitted to obtaining secondhand information regarding Silver's involvement in the murders, the trial court's limiting instruction — telling the jury that James's statements in the 9-1-1 recording were not offered for the truth of the matter asserted — did not cure the purported Confrontation Clause violation. In support of that belief, Silver cites *State v. Beckwith*, 2012-Ohio-3076 (8th Dist.) (concluding that a limiting instruction was insufficient to cure the improper admission of a codefendant's inculpatory testimony). Silver's singular reliance on *Beckwith* is misplaced.

{¶ 21} In *Beckwith*, the defendant committed robbery and murder with several codefendants. One of the codefendants testified at Beckwith's trial, stating that another witness said that the defendant committed the crimes. *Beckwith* at

¶ 21. The *Beckwith* panel primarily relied on *State v. Moritz*, 63 Ohio St.2d 150 (1980), paragraphs one and two of the syllabus, which held that

> [a]n accused's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment is violated in a joint trial with a non-testifying codefendant by the admission of extrajudicial statements made by the codefendant inculpating the accused. (*Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.E.2d 476 [(1968)], followed.)

> A violation of an accused's right to confrontation and cross-examination is not prejudicial where there is sufficient independent evidence of an accused's guilt to render improperly admitted statements harmless beyond a reasonable doubt.

*Id.* After noting the circumstantial nature of the conviction at issue, the *Beckwith* panel reversed the conviction based on the prejudice caused by the inadmissible testimony presented to the jury. *Id.* *Beckwith* has yet to be extended beyond the limited situation of a codefendant's incriminating testimony. *State v. Miller*, 2021-Ohio-2924, ¶ 53-56 (8th Dist.) (distinguishing and not applying *Beckwith*); *State v. A.M.*, 2018-Ohio-4209, ¶ 82 (8th Dist.) (Kilbane, J., dissenting) (citing *Beckwith* in disagreement with the majority); *State v. Miller*, 2014-Ohio-3907, ¶ 40 (8th Dist.) (distinguishing and not applying *Beckwith*).

{¶ 22} This is for good reason. *Moritz* expressly applied *Bruton*, which over the last five decades has never been expanded beyond the limited circumstance of "where a defendant is directly incriminated by the extrajudicial statements of a non-testifying codefendant." *Smith v. Arizona*, 602 U.S. 779, 817-818 (2024) (Thomas, J., concurring), citing *Samia*, 599 U.S. at 654. *Beckwith*'s conclusion arguably

extends *Bruton* to include in-court testimony of codefendants but only in that limited context. *Beckwith* is inapplicable to the posture of this case.

{¶ 23} Silver's requested proposition — that a limiting instruction with respect to unrelated, eyewitness testimony can never cure a purported violation of the Confrontation Clause — is not based on any controlling authority. To the contrary, the Supreme Court has held that a limiting instruction may be used in admitting evidence of nontestifying witnesses, even if those statements indirectly incriminate the defendant. *See generally Samia* at 655 (holding that the Confrontation Clause "was not violated by the admission of a nontestifying codefendant's confession that did not directly inculpate the defendant and was subject to a proper limiting instruction"). Thus, limiting instructions may be used to avoid Confrontation Clause issues through case-specific analysis. Because Silver relies on a general proposition that is not supported by any authority, the first, second, and fifth assignments of error are overruled.

{¶ 24} In the sixth assignment of error, Silver claims that he was deprived of a fair trial because the trial court admitted crime-scene and autopsy photos that Silver deems to be gruesome and that offered little probative value as contrasted to the inflammatory and undue prejudicial effects. According to Silver, "[c]ertainly, it was not necessary to depict every wound and every spent shell casing in a prosecution where the cause and manner of death was uncontested as well as the fact of the pregnancy." Although that sentiment is understandable, it provides no framework to resolve the question presented.

{¶ 25} In general, "gruesome" photographs are admissible if that evidence is relevant and of probative value to assist the trier of fact in determining the issues, "or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." *State v. Franklin*, 62 Ohio St.3d 118, 125 (1991), citing *State v. Maurer,* 15 Ohio St.3d 239, 264-266 (1984), and Evid.R. 403. "'[T]he admission of photographs is left to the sound discretion of the trial court.'" *Maurer* at 264, citing *State v. Wilson*, 30 Ohio St.3d 199, 203-204 (1972).

{¶ 26} There are 86 photographs in this record. There is no doubt that some photos are necessary to provide the jury with background information. The sole question is which of the photographs are considered "gruesome."

{¶ 27} Not all postmortem photographs constitute "gruesome" images. *State v. Motley*, 2023-Ohio-1811, ¶ 45 (8th Dist.). A picture of a corpse, in and of itself, does not necessarily rise to that level. *See State v. Froman*, 2020-Ohio-4523, ¶ 105; *State v. Kirkland*, 2020-Ohio-4079, ¶ 105. This is because some individuals may be more desensitized to morbid scenes than others, and as a result, the determination of whether a photograph pushes the limits is fact-dependent. Generally speaking, the photos must have "shock value." *State v. Depew*, 38 Ohio St.3d 275, 281 (1988).

{¶ 28} Beyond that, there is the question of how many photographs are necessary to the State's burden to prove its case beyond a reasonable doubt. There

is no arbitrary limit; it is also entirely case-dependent. *See State v. Garrett*, 2022-Ohio-4218, ¶ 114 (the introduction of 17 crime-scene photographs depicting close-up photographs of the victims' heads and faces was deemed not an abuse of discretion despite the fact that both victims had been the victims of sharp-forced injuries to the head and face); *State v. Watson*, 61 Ohio St.3d 1 (1991) (five photographs depicting the victim whose "brain was literally blown out of his skull" was too many, although the error was harmless); *State v. Graham*, 2021-Ohio-3199 (8th Dist.) (affirming the introduction of over 100 photographs described as "gruesome").

{¶ 29} The standard of review for the introduction of evidence is abuse of discretion. On this point, Silver has not demonstrated that the trial court abused its discretion as to any specific photograph. And further, even if we took the extraordinary step of assuming that any of the photographs were gruesome, Silver has not demonstrated, let alone argued, the existence of prejudice from their introduction into evidence. His sole argument on this point is that the "gruesome" nature of the photographs prejudiced him at trial solely based on the nature of the photographs themselves. Prejudice is not merely assumed. It must be demonstrated based on the totality of the evidence presented at trial. *Motley* at ¶ 50, citing *State v. Lundgren*, 73 Ohio St.3d 474, 486 (1995) (concluding that the defendant was not prejudiced solely from the introduction of the photographs deemed inadmissible), citing Evid.R. 103 and Crim.R. 52(A).

{¶ 30} In light of the limited argument presented, the sixth assignment of error is overruled.

{¶ 31} In the third assignment of error, Silver claims his convictions are based on insufficient evidence.

{¶ 32} When determining whether a verdict is supported by sufficient evidence, "'[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Wilks*, 2018-Ohio-1562, ¶ 156, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Credibility is not an issue. *See State v. Pountney,* 2018-Ohio-22, ¶ 19, citing *Jenks* at paragraph two of the syllabus.

{¶ 33} For the purposes of the murder convictions, Silver focuses on the circumstantial evidence to the almost near exclusion of his confession to the cellmate. That confession, along with James's testimony regarding the shooting, are sufficient in and of themselves and solely depend on credibility determinations that are outside the scope of a sufficiency analysis. All arguments pertaining to the counts arising from the murders can only be addressed under the weight-of-the-evidence standard.

{¶ 34} The sole exception is Silver's argument pertaining to the aggravated burglary conviction, resulting in a 10-year and 54-month prison term for the underlying offense and firearm specification. On that single conviction, Silver claims the State failed to present any evidence of a trespass being committed by

force, stealth, or deception, an element of the aggravated burglary crime. According to Silver, entering the room of a sleeping occupant is insufficient to prove entry by stealth. *But see State v. Stone*, 2024-Ohio-177, ¶ 27 (2d Dist.) (concluding that occupants being asleep satisfies the definition of a stealthy trespass); *State v. Steen*, 2020-Ohio-4598, ¶ 29 (2d Dist.) (string citing cases concluding that "entering an open door at night while under the cover of darkness," especially if the occupants are likely to be asleep, is sufficient to establish the element of stealth).

{¶ 35} Silver relies on two inapplicable cases in support of his argument: *State v. Adams*, 2015-Ohio-3954, and *State v. Bertram*, 2023-Ohio-1456. In *Adams*, the Ohio Supreme Court concluded that the State failed to demonstrate a forcible entry into the apartment, and "although it is possible that [the defendant] entered through stealth or deception, there was no probative evidence of either" offered by the State. *Adams* at ¶ 23. In short, the State never addressed the manner in which the entry occurred in *Adams*. That conclusion cannot be made in this case. The State's evidence demonstrated that Silver sneaked into the murdered victims' room — catching them all by surprise to the extent that their bodies were found where they were sleeping or lying. There is ample evidence that Silver entered the room by actively avoiding discovery, enough so that no one was aware of his presence until it was too late. *Stone* at ¶ 27; *Steen* at ¶ 30. Because Silver has not discussed the stealth component on his sneaking up on sleeping or distracted occupants, his argument is without merit. Stealth, or avoiding discovery, is one method to prove the crime of aggravated burglary. *See Bertram* at ¶ 21 (without

evidence of force, "the state must prove that the defendant actively avoided discovery or used deceptive conduct to gain entry").

{¶ 36} With respect to the other case relied on by Silver, the rationale supporting the reversal of the conviction in *Bertram* is likewise inapplicable. In that case, the defendant simply walked into the victim's garage in full view of the victim and without any force or attempt to deceive the victim. *Id.* at ¶ 17. That brazen entry into the structure has no bearing on Silver's entrance into the room of the victims.

{¶ 37} Silver failed to demonstrate that any of his convictions were based on insufficient evidence. The third assignment of error is overruled.

{¶ 38} In the fourth assignment of error, the final one for the purposes of this appeal, Silver claims his convictions are against the weight of the evidence.

{¶ 39} When evaluating a claim that a verdict is against the manifest weight of the evidence, "we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *Wilks*, 2018-Ohio-1562, at ¶ 168, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Reversing a conviction based upon the weight of the evidence should occur "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172 (1st Dist. 1983).

{¶ 40} Silver focuses on the credibility of James and the cellmate, and the circumstantial connection between him and the firearm used in the murders. The inconsistencies and the credibility issues of the testifying witnesses were presented to the jury along with the shortcomings of the State's case tying Silver to the murder weapon. The simple fact that the jury believed the State's evidence and found James's and the cellmate's testimony credible despite the limitations and impeachment of the witnesses, is not in and of itself a basis to declare the convictions to be against the weight of the evidence. It has long been held that the trier of fact is free to believe all, some, or none of the evidence presented by the State or defense at trial. *State v. Smith*, 2010-Ohio-4006, ¶ 16 (8th Dist.). Simply identifying the inconsistencies or avenues of impeachment is not sufficient to meet the high burden to prove the conviction is against the weight of the evidence.

{¶ 41} Silver's admission to his cellmate largely doomed him. Nothing about the cellmate's testimony clearly demonstrated an inherent credibility issue infecting the prosecution, and the same rationale applies to James's testimony identifying Silver as the person who shot him. As a result, Silver has not demonstrated that the trier of fact clearly lost its way. The fourth assignment of error is overruled.

{¶ 42} Having overruled the arguments as presented, Silver's convictions are affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
SEAN C. GALLAGHER, JUDGE

MICHELLE J. SHEEHAN, P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR